**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Plaintiff, | ) | 8:05CR422 |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | RECOMMENDATION |
| **DENNIS E. SMITH and** | ) | |
| **ROSE MEROLLA,** | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the motions to suppress filed by the defendant Dennis E. Smith (Smith) (Filing No. 15) and by defendant Rose Merolla (Merolla) (Filing No. 19). Merolla also moved to dismiss Count IV of the Indictment as to her (Filing No. 18). The Indictment charges Smith in Count I with the possession with intent to distribute less than 50 kilograms grams of marijuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1). Count II charges Smith with the use and carrying of a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c). Count III charges Merolla with the possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g). Count IV charges Smith and Merolla in a criminal forfeiture count alleging various property was used to commit or to facilitate the offenses in Counts I, II and III pursuant to 21 U.S.C. § 853.

In their motions to suppress, Smith and Merolla seek to suppress all evidence seized by the Omaha Police Department (OPD) on October 14-15, 2005, from a storage facility at 69th and L Streets in Omaha, Nebraska, and from a residence at 4618 Center Street in Omaha, Nebraska. Both defendants also seek to suppress statements they may have made to police officers on the evening of October 14-15, 2005.

An evidentiary hearing on the motions was held on January 5 and January 19, 2005. Smith was represented by Alan G. Stoler and Merolla was represented by W. Russell Bowie. The United States was represented by Special Assistant U.S. Attorney Jennie Dugan-Hinrichs. The court heard the testimony of Officers Robert Branch, Jr. (Officer Branch), Mark Lang (Officer Lang), and Jeffrey Hunter (Officer Hunter) and Sergeant Greg Gonzalez (Sergeant Gonzalez) of the OPD. The court also received into evidence the

following exhibits: an Application and Affidavit for a Search Warrant and Search Warrant [storage facility] (Exhibit 1); an Application and Affidavit for a Search Warrant and Search Warrant [4618 Center Street] (Exhibit 2); a (Nebraska State Patrol) NSP records check (Exhibit 3); a photograph of a residence (Exhibit 4); a copy of Neb. Rev. Stat. § 29-814.03 (Exhibit 101); and an NSP Msg dated 10/14/2005 (Exhibit 103). A transcript (TR.) of the hearing was filed on January 30, 2006 (Filing No. 37). There was no post-hearing briefing.

## FINDINGS OF FACT

Prior to October 3, 2005, Officer Hunter received information from his former sergeant, Sergeant Mark Langan, who informed him that an employee of a furniture delivery company reported seeing a "brick" of marijuana at a residence in Omaha when furniture was delivered (TR. 126). Sergeant Langan did not have an address at that time (TR. 126). On October 3, 2005, Officer Hunter was again contacted by Sergeant Langan who informed him that the address was 4618 Center Street in Omaha (TR. 127). Sergeant Langan also informed Officer Hunter that the furniture delivery person who saw the "brick" of marijuana was given $20 by a tall white male at the residence so that the delivery person would not say anything (TR. 127). Officer Hunter understood that the "brick" of marijuana was more than one pound and was indicative of a person dealing in marijuana (TR. 127). Officer Hunter queried the OPD computer system and determined that 4618 Center Street was listed to Dennis Smith who was a white male, approximately six feet tall and weighing 145 pounds, and which was consistent with the description provided by the furniture delivery person (TR. 128). Officer Hunter conducted several drive-by surveillances to observe any unusual traffic at the residence (TR. 128). Officer Hunter observed a male with a pit bull in the front yard on one occasion and several full-sized SUVs parked at the residence (TR. 129). Officer Hunter conducted no further investigation at the time (TR. 129).

On October 14, 2005, Officer Hunter was conducting an unrelated investigation at 6959 L Street in Omaha (TR. 129). While conducting that investigation, a manager informed Officer Hunter there was another suspicious individual who frequented the storage facility (TR. 129). The manager informed Officer Hunter that this individual was a young

male who drove different fancy, expensive full-sized SUVs and did not appear to have a job since he was at the storage facility at all different times and hours (TR. 129). The manager informed Officer Hunter that the young man had three outside stalls in his name and one enclosed unit in a female's name (TR. 129). The manager informed Officer Hunter the young man would pay in cash when it came time to pay the bills and the young man always had a "wad" of cash (TR. 129-130). The young man would store boats, jet skis, and other items in the storage facility which aroused the manager's and Officer Hunter's suspicions about the young man (TR. 130). The outside storage units, Numbers 3430, 3431, and 3432 were in the name of Dennis Smith, and the inside unit Number 208 was in the name of Lisa Austin (TR. 130). The manager showed Officer Hunter the office file for the storage unit and the file contained a photocopy of Smith's driver's license and Officer Hunter immediately recognized Smith's photo as that of the photo of the person he retrieved when doing the computer search for 4618 Center Street and as the person Officer Hunter observed playing with the pit bull in the front yard of 4618 Center Street when Officer Hunter conducted the drive-by surveillance (TR. 131). The manager also told Officer Hunter that he had never seen Lisa Austin at the units, only Smith (TR. 132).

Officer Hunter was planning a canine sniff on another unit at the storage facility in an unrelated case (TR. 132). When the OPD canine officer arrived, Officer Hunter had the drug canine deployed down the row of storage units numbers 212 to 206 (TR. 132). The canine twice alerted to the door at Unit 208 (TR. 132). As a result of the positive canine alert, Officer Hunter prepared an affidavit for a search warrant for Unit 208 (TR. 133). A search warrant was authorized by a County Judge of Douglas County and executed at Unit 208, 6959 L Street, in Omaha on October 14, 2005 (Exhibit 1; TR. 134). Upon gaining entry into Unit 208, Officer Hunter detected a strong odor of marijuana (TR. 134). Found during the search was a triple beam pound scale, a Glock .45 caliber empty magazine, two firearms (a .22 caliber Derringer and a .380 millimeter handgun), a 10x10 trailer registered to Dennis Smith, and various documents (TR. 134). Officer Lang reviewed the documents and determined the documents had notations consistent with drug records (TR. 93-94). A check was run on the firearms, and the .380 firearm was determined to be a stolen firearm from Harrison County, Iowa (TR. 136; Exhibits 3 and 103). During the search,

management at the storage facility informed the officers that Smith was now driving a Cadillac Escalade SUV (TR. 138).

At approximately 2120 hours on October 14, 2005, Officer Lang proceeded to 4618 Center Street to take up a surveillance position of that residence while other officers finished the search at the storage facility (TR. 138). After the completion of the search, the plan was for officers to meet at a bank parking lot at 44th and Center Streets, discuss the events, don raid gear, approach the residence at 4618 Center Street and conduct a "knock and talk" (TR. 138). Officer Lang did a drive-by of 4618 Center Street and observed a Cadillac Escalade parked in the driveway of 4618 Center Street (TR. 95). The license plates were checked and found to be registered to Dennis Smith (TR. 96). Officer Lang also noticed the front door to be open and several individuals inside the residence (TR. 96). From a vantage point of approximately a block away, Officer Lang noticed a big screen television on and movement of individuals inside near the television (TR. 96). He also observed lights go on and off in the upstairs southwest room (TR. 96). Officer Lang also saw two individuals, one a male, leave the residence, walk toward the Cadillac Escalade, and eventually return inside the residence (TR. 97). Officer Lang maintained his stationary surveillance and did not join the briefing at the bank parking lot but was in contact with the officers by telephone (TR. 97).

Following the completion of the search at the storage unit, the remaining officers met at the bank parking lot (TR. 59; 139). Sergeant Gonzalez had the officers don their raid vests and gear not only to identify themselves but because weapons were found in the storage unit (TR. 98). Sergeant Gonzalez assigned Officers Hunter, Deignan, and Branch to approach the front door (TR. 60). Officer Deignan was in a police uniform and was driving a marked OPD vehicle which was to be parked out front of the residence (TR. 60). Sergeant Gonzalez was to take up a position at the side of the house and Officer Lang was to take the rear perimeter of the residence so he could observe the rear door (TR. 60; 98). As the officers approached the residence, an exterior camera was observed mounted on the southeast corner of the residence and there were two dogs, one inside and one outside (TR. 62). The dog inside began barking and the dog outside, a pit bull, was quiet in a kennel (TR. 63).

Officer Hunter approached the front door and immediately detected a strong odor of raw marijuana similar to that detected in the storage unit just searched (TR. 141). Officer Hunter knocked on the door several times without response (TR. 141). Officer Branch, standing further out in the yard, observed a male in an upstairs bedroom looking out of the window through a screen (TR. 8). Officer Branch spoke to the male and told him that they were Omaha police officers and that he needed to come downstairs and speak with the officers (TR. 8). Officer Hunter was also knocking stating "Omaha Police. Come to the door" (TR. 141). Gene Smith, Dennis Smith's brother, came downstairs and answered the door by opening the inner door (TR. 9). As the inner door opened slightly, Officer Branch smelled an "extremely strong" odor of marijuana (TR. 9-10). Officer Hunter realized that Gene Smith, was not Dennis Smith and asked if Dennis Smith was at the house (TR. 141). When Gene Smith said "yes," Officer Hunter said "I need to speak with him" (TR. 141). The front door to 4618 Center Street was a full glass storm door with a steel entry door, with a frosted glass half the size of the glass storm door (TR. 142). Gene Smith closed the inner steel door (TR. 142). When no one came to the door, Officer Hunter knocked again on the outer door announcing "Omaha Police. We need to talk to you" (TR. 142).

Dennis Smith came to the door and opened the inner door accompanied by an unhappy pit bull (TR. 142). The pit bull was barking and lunging at the door (TR. 143). Officer Hunter kept his foot pressed against the glass outer door to keep the pit bull from coming outside (TR. 142). Officer Hunter informed Dennis Smith: "I'm an Omaha police officer, Narcotics Unit. I need to talk to you" (TR. 143). Officer Hunter asked Smith if Smith could put the dog away and step outside to talk with the officers (TR. 143). Smith asked what the officers wanted and why they were there (TR. 143). Officer Hunter reiterated his request to put the dog away and step outside to talk with the officers on the front porch (TR. 143). Smith agreed to come outside and stepped outside closing the front door behind him (TR. 143). Officer Hunter detected a strong odor of raw and burnt marijuana coming from the house and from Smith's person (TR. 144). Smith came out onto the porch, walked west on the porch, and had a seat in a chair on the porch (TR. 145). Officer Hunter told Smith that the Omaha Police Narcotics Unit was conducting an investigation on a drug complaint and also needed to talk with Smith about a storage unit which was just searched at 6959

L Street (TR. 145). Smith said "Don't know what you are talking about. There's no drugs here" (TR. 145). Officer Hunter, smelling marijuana on Smith, asked Smith if he had been smoking marijuana (TR. 145). Smith said his friends had been smoking (TR. 145). Whereupon, Officer Hunter told Smith that Smith reeked of marijuana (TR. 145). Smith did not respond but hung his head (TR. 145). Officer Hunter asked Smith for consent to search the house "to clear up the investigation" (TR. 145). Smith asked Officer Hunter if the officer had a search warrant (TR. 145). When told the officers did not have a search warrant but they could go and apply for a search warrant, Smith told the officers to go get a search warrant (TR. 145-146).

In the meantime, Officer Lang, who had positioned himself at the rear of the residence, was looking for additional cameras after being told of the camera at the southeast corner of the house (TR. 100). Officer Lang re-positioned himself six or seven feet from the rear door where he could look into the rear of the house and see the front door (TR. 101). Officer Lang testified he could see through partially opened mini-blinds in towards the kitchen beyond into the living room towards the front door (TR. 101). Officer Lang could also see a staircase leading to the second floor (TR. 101). Initially, Officer Lang observed three individuals, one a male, later identified as Gene Smith, standing at the front door which was approached by the other OPD officers (TR. 101). Officer Lang saw Gene Smith place a pit bull in a downstairs bathroom (TR. 103). A short time later, another male, later identified as Dennis Smith, came down the stairs towards the front door (TR. 101). Shortly thereafter, a female, later identified as Rose Merolla, came down the stairs, paused near the front door, and then walked to the kitchen area (TR. 102-104). Officer Lang observed Merolla quickly sweep her hand across the top of the kitchen counter top into a bowl-type container and place the bowl in a lower cabinet drawer (TR. 104). Officer Lang believed that since officers were at the front door, efforts were being made to conceal evidence that was in plain view (TR. 105). Officer Lang reported what he saw to Sergeant Gonzalez (TR. 106; 66).

Sergeant Gonzalez was at the front porch area and joined in the conversation with Dennis Smith (TR. 64). Sergeant Gonzalez left the front porch area and received a report from Officer Lang (TR. 66). After Sergeant Gonzalez received the report from Officer Lang,

Sergeant Gonzalez walked to the front porch area where Dennis Smith was located (TR. 65). By this time, Denis Smith was in handcuffs and Sergeant Gonzalez stated he was going to secure the residence before getting the search warrant (TR. 66-68). Sergeant Gonzalez told Dennis Smith: "I smell marijuana. There's people inside. If we don't get consent, we're kicking the door" (TR. 66). Smith began yelling directing his voice toward the inside of the house: "Do not open the door" (TR. 68). Officer Branch recalled four or five loud verbal commands of: "Open the door. Omaha Police. Put the dog away." (TR. 13). Apparently, Merolla or Gene Smith placed the pit bull in a downstairs bathroom (TR. 16). The officers began instructing those on the inside of the house near the door: "We're police officers. Open the door or we're going to kick the door" (TR. 69). Receiving no response, Sergeant Gonzalez ordered Officer Branch to kick in the door (TR. 69). Officer Branch kicked in the door and entered with his gun drawn (TR. 13). Officer Branch encountered Merolla and ordered her to the floor (TR. 14). Merolla was handcuffed (TR. 14). Officer Branch was quickly followed inside by Sergeant Gonzalez and Officers Lang and Deignan who rushed upstairs (TR. 14). Gene Smith was escorted downstairs, handcuffed, and place on a couch in the living room with Merolla (TR. 15). Officer Lang observed what appeared to be marijuana residue on top of the counter top where Merolla was observed to be sweeping her hand prior to the officers' entry (TR. 109). Dennis Smith was vociferous in making comments such as: "you can't do this. This is BS" and other such comments (TR. 148). Dennis Smith was brought inside and seated on the couch with his brother and Merolla (TR. 148). Merolla and Dennis Smith were upset and were separated after they would not cease talking with each other as instructed by the officers (TR. 15). Dennis Smith was taken back outside and seated on the porch with Officer Lang (TR. 150). Merolla was escorted into the kitchen area where she was identified and asked for permission to search the residence (TR. 15-16). Merolla denied the officers permission to search (TR. 16).

While Dennis Smith was seated on the porch with Officer Lang, Dennis Smith asked Officer Lang questions about what was found in the storage unit (TR. 110). Officer Lang informed Smith he was not going to answer Smith's questions and told Smith to be quiet (TR. 110). Officer Lang told Smith that Officer Hunter was the case officer and that Smith

could ask Officer Hunter these questions later (TR. 110). Smith continued to ask Officer Lang questions including: "What are you talking about, the guns in the storage unit?" (TR. 110). Officer Lang again told Smith to hold his questions for Officer Hunter, but Smith persisted in saying that he (Smith) obtained the guns from a 14-year old who had found the guns and that Smith had purchased the guns for $100 (TR. 110-111).

The officers contacted the Omaha Humane Society to come to the residence and take care of the pit bull and when they arrived, Merolla's handcuffs were removed so she could assist the Humane Society officers in removing the pit bull from the bathroom (TR. 16). Once the pit bull was removed, Merolla was recuffed (TR. 16). Since the bathroom was not swept in the protective sweep when the officers entered the residence, Officer Branch checked the bathroom (TR. 17). Officer Branch testified he was overwhelmed by the odor of marijuana and observed two large black trash bags in the shower stall (TR. 17). Officer Branch returned to the kitchen area and advised Merolla of her *Miranda* rights (TR. 18). Merolla waived her rights and agreed to answer Officer Branch's questions without an attorney present (TR. 19). Thereafter, Merolla made admissions to Officer Branch including the presence of a black pump shotgun underneath her bed (TR. 19). Following Officer Branch's interview, Merolla was taken back to the living room and seated on the couch (TR. 20). Through a records check, Merolla was found to have been convicted of a felony (TR. 21).

Following the entry into the residence, Sergeant Gonzalez and Officer Hunter left at approximately 10:15 p.m. to prepare and obtain the search warrant (TR. 151). The affidavit and application for the search warrant recited the search results of the storage unit following the execution of the search warrant for that storage facility (Exhibit 2). The affidavit further set out the officers' detection of a strong odor of marijuana coming from the residence at both times when the front door was opened and detailed the observation of Merolla's wiping an unknown substance from the kitchen counter and placing the substance beneath a kitchen counter (Exhibit 2). The affidavit further detailed the officers' observation of marijuana residue on the kitchen counter when they entered the residence to secure the premises before obtaining the search warrant (Exhibit 2). A search warrant was signed by Douglas County Court Judge John Huber, and Sergeant Gonzalez and Officer Hunter

returned to 4618 Center Street with the search warrant shortly after midnight on October 15, 2005 (Exhibit 2; TR. 151). Thereafter, a search was conducted of the premises (TR. 151).

     While the search was being conducted and during the time that seized items were brought to the kitchen area where items were being placed on the inventory, Dennis Smith was seated at the entry way to the kitchen area (TR. 152). As Officer Hunter was weighing out individual bags of marijuana found in the large black trash bags discovered in the bathroom, Dennis Smith stated: "Yeah, they should all weigh 457 grams" (TR. 153). Dennis Smith also stated that the weight would include 10 grams for the bag weight (TR. 153). While shaking his head, Dennis Smith stated he was going to owe a lot of money since the marijuana cost him $1200 per pound and that people were not going to be happy with him (TR. 153). When the gun was tagged and inventoried, Dennis Smith stated that the gun was broken and he was going to take it to a friend to be fixed (TR. 152-154). After a storage area underneath a stairwell by the kitchen where Dennis Smith was seated was searched, officers found an additional thirty pounds of marijuana individually packaged for sale (TR. 154). Upon the discovery, Dennis Smith stated: "I really wish you guys hadn't found that. Can't you guys just take the first 30 and leave that?" (TR. 155).

     Upon completion of the search, Officer Hunter placed Dennis Smith in his police vehicle and began to drive to Central Police Headquarters (TR. 155). As the car approached the eastbound ramp onto Interstate 80 near 42nd Street, Dennis Smith told Officer Hunter: "Well, you might as well pick up that trash bag over there" (TR. 156). When Officer Hunter asked Dennis Smith what he was talking about, Dennis Smith drew Officer Hunter's attention to a white trash bag sitting out in the middle of the grass near the ramp (TR. 156). Officer Hunter asked Dennis Smith if Smith was kidding, and Smith indicated he was serious (TR. 156). Officer Hunter, backed up, pulled over, and got out of the car (TR. 156). Officer Hunter cut open the bag and noted a bunch of packaging material (TR. 156). Officer Hunter placed the bag in the back seat of the van he was driving, and resumed his trip to Central Police Headquarters with Dennis Smith (TR. 156).

**LEGAL ANALYSIS**

**A. Merolla's Motion to Dismiss (Filing No. 18)**

Merolla seeks to dismiss Count IV of the Indictment as to her as failing to state an offense against her. Count IV charges a criminal forfeiture count under 21 U.S.C. § 853. Since Section 853 requires a predicate offense of a drug trafficking offense under Title 21 and Merolla is charged only in Count III of the Indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922, Merolla's motion has merit. During the evidentiary hearing, the government conceded that Merolla's motion to dismiss Count IV as to Merolla should be granted (TR. 122). Accordingly, it will be recommended to Judge Smith Camp that Count IV of the Indictment be dismissed as to Merolla.

**B. Motion to Suppress Search of Storage Unit (Filing No. 19)**

Dennis Smith did not challenge the issuance or validity of the search warrant for the storage facility. To the extent Merolla challenged the search of the storage facility in her motion to suppress (Filing No. 19), Merolla conceded at the hearing that she lacked standing and withdrew that part of her motion to suppress (TR. 133). Accordingly, it will be recommended to Judge Smith Camp that such portion of Merolla's motion to suppress items seized from the storage facility at 6959 L Street, Unit 208, Omaha, Nebraska, be denied.

**C. Warrantless Entry into 4618 Center Street**

Both Dennis Smith and Merolla assert the officers warrantless entry into the residence at 4618 Center Street was illegal and that any evidence obtained thereafter including statements by the defendants should be suppressed. The government asserts the warrantless entry was based on exigent circumstances and the police officers diligently obtained a search warrant following the entry.

The Fourth Amendment prohibits "unreasonable searches and seizures" and assures "the right of the people to be secure in their persons, houses, papers, and effects." "[T]he 'touchstone of the Fourth Amendment is reasonableness.' Reasonableness, in turn,

is measured in objective terms by examining the totality of the circumstances." ***Ohio v. Robinette***, 519 U.S. 33, 39 (1996) (**citing *Florida v. Jimeno***, 500 U.S. 248, 250 (1991)).

"In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." ***Payton v. New York***, 445 U.S. 573, 589-90 (1980) (citations omitted); **see *also United States v. Vance***, 53 F.3d 220, 221 (8th Cir. 1995). "Police officers may not enter or search a home without a warrant unless justified by exigent circumstances." ***United States v. Ball***, 90 F.3d 260, 263 (8th Cir. 1996). The exigent-circumstances requirement does not, however, vitiate, but is in addition to, the need for probable cause. **See *United States v. Duchi***, 906 F.3d 1278, 1282 (8th Cir. 1990). Under the "exigent circumstances" exception, "the warrant requirement is suspended 'when--in the press of circumstances beyond a police officer's control--lives are threatened, a suspect's escape looms, or evidence is about to be destroyed.'" ***United States v. Johnson***, 12 F.3d 760, 764 (8th Cir. 1993) (citations omitted). "The exigent circumstances exception to the warrant requirement is narrowly drawn." ***Ball***, 90 F.3d at 263. The government bears the burden of establishing that exigent circumstances existed. ***Id.***

An exigency must be assessed in light of the totality of the circumstances. ***United States v. Wihbey***, 75 F.3d 761, 765 (1st Cir. 1996). The critical time for determining whether an exigency exists "is the moment of the warrantless entry by the officers onto the premises of the defendant." ***United States v. Morgan***, 743 F.2d 1158, 1162 (6th Cir. 1984). "The 'exigent circumstances' inquiry is limited to the objective facts reasonably known to, or discoverable by, the officers at the time of the search." ***United States v. Tibolt***, 72 F.3d 965, 969 (1st Cir. 1995).

In this case, the officers knew the following facts immediately prior to the forced entry of the residence: a delivery person observed a "brick" of marijuana while delivering furniture at 4618 Center Street and was asked not to tell anyone; a search of a storage facility connected to Dennis Smith at 4618 Center Street revealed drug records, a strong odor of marijuana, and a stolen firearm; the residence at 4618 Center Street was equipped with an outside surveillance camera; there was a pit bull inside the house and in a kennel

in the rear of the house; there was considerable delay in getting someone to answer the door when the police officers initially knocked on the front door; there was a strong odor of marijuana coming from inside the house and from the person of Dennis Smith; although Dennis Smith was on the porch of the house refusing consent for the officers to enter the house, there were at least two other persons in the residence; Officer Lang observed Merolla sweeping material from a kitchen counter which he interpreted as an attempt to secrete or remove evidence; and the two people in the house were scurrying about while Dennis Smith was loudly and frantically directing them not to let the officers in the house. Focusing on what a reasonable police officer would believe, the court finds there was a legitimate concern for the destruction or removal of evidence at the premises if the officers were not to enter the house and secure the premises to await the issuance of a search warrant. **See *United States v. Auburn***, 412 F.3d 909, 915 (8th Cir. 2005). Accordingly, the court finds the government has established that there existed exigent circumstances to permit the officers to make a warrantless entry into the house under the Fourth Amendment.

### D. The Protective Sweep

When the officers entered the forcefully entered the house, they made a protective sweep of the residence for persons in the house and brought them under control in the living room. During the protective sweep, officers observed in "plain view" what was believed to be marijuana residue on a kitchen counter. This observation was noted in the affidavit for the search warrant for the premises. There is no evidence the officers exceeded the scope of their protective sweep and conducted a search of the premises prior to the arrival of the search warrant. Their actions were necessary to protect the law enforcement team from any harm that could be posed by other parties still in the residence. ***Maryland v. Buie***, 494 U.S. 325, 337 (1990); ***United States v. Boyd***, 180 F.3d 967, 975 (8th Cir. 1999). Even though Dennis Smith was detained on the front porch and Merolla and Dennis Smith were detained when encountered in the residence, the officer's protective sweep of the residence was justified. **See *United States v. Horne***, 4 F.3d 579, 586 (8th Cir. 1993); ***United States v. Hoyos***, 892 F.2d 1387, 1397 (9th Cir. 1989), **cert.**

**denied**, 498 U.S. 825 (1990), **overruled on other grounds by** *United States v. Ruiz*, 257 F.3d 1030 (9th Cir. 2001); *United States v. Lucas,* 898 F.2d 606 (8th Cir. 1990); *United States v. Queen*, 847 F.2d 346, 352-54 (7th Cir. 1988); *United States v. Silva*, 745 F.2d 840, 847 (4th Cir. 1984); *United States v. Jackson*, 700 F.2d 181, 189 (5th Cir. 1983). As the Ninth Circuit has stated: "Courts must be careful not to use hindsight in limiting the ability of police officers to protect themselves as they carry out missions which routinely incorporate danger." *United States v. Astorga-Torres*, 682 F.2d 1331, 1335 (9th Cir. 1982) (**quoting** *United States v. Coates*, 495 F.2d 160, 165 (D.C. Cir. 1974)). The protective sweep in this case was justified.

Further the notation and use of such information in the affidavit for the search warrant was justified. Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *United States v. Beatty*, 170 F.3d 811, 814 (8th Cir. 1999). Accordingly, the officers would have been justified in seizing the marijuana residue let alone simply noting such information for inclusion in the search warrant affidavit.

### E.  The Search Warrant

An affidavit for a search warrant must contain probable cause of four ingredients: time, crime, objects, and place. As the Supreme Court stated in *Illinois v. Gates*, 462 U.S. 213, 238 (1983): "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* Thus, when viewing a search warrant, the court must look at the totality of the circumstances set forth in the affidavit. **See** *id.*; *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999). "The duty of the judge issuing a search warrant is to make a 'practical, common-sense decision' whether, considering all the circumstances, a reasonable person could have reason to suspect that evidence would be discovered. . . . Probable cause is

a fair probability that contraband evidence of a crime will be found in the location to be searched." ***United States v. LaMorie***, 100 F.3d 547, 552 (8th Cir. 1996). **See** *Gates*, 462 U.S.

A review of the affidavit for the search warrant in this case established probable cause that contraband will be found at 4618 Center Street. Furthermore, even if there was a determination that the officers had illegally entered the residence to conduct a protective sweep and during such sweep observed the marijuana residue on the counter, the elimination of such information from the affidavit for the search warrant would not render the affidavit deficient in probable cause. There would have been sufficient probable cause set forth without the inclusion of such information.

### F. The Statements

The defendants argue the statements they made to law enforcement while at the residence should be suppressed. There is no dispute Dennis Smith was placed under arrest, but not yet given *Miranda* warnings prior to the statements he made. The court must determine whether the statements were made pursuant to a custodial interrogation.

The Self-Incrimination Clause provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "[T]he core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial." ***United States v. Patane***, 542 U.S. 630, 637 (2004).

> [I]n *Miranda*, the Court concluded that the possibility of coercion inherent in custodial interrogations unacceptably raises the risk that a suspect's privilege against self-incrimination might be violated. To protect against this danger, the *Miranda* rule creates a presumption of coercion, in the absence of specific warnings, that is generally irrebuttable for purposes of the prosecution's case in chief.

*Patane*, 542 U.S. at 639 (**citing** ***United States v. Dickerson***, 530 U.S. 428, 434-35 (2000); ***Miranda v. Arizona***, 384 U.S. 436, 467 (1966)).

"Interrogation in the *Miranda* context refers to express questioning and to words or conduct that officers should know is 'reasonably likely to elicit an incriminating response

from the suspect.'" *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004) (**quoting** *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). "Miranda does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." *Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989) (quotation omitted).

In *Briones*, the defendant was standing in the state patrol lobby before being transported to a detention center, when officers led Briones' girlfriend past Briones and out of the building. After seeing his girlfriend, Briones "blurted out that she had nothing to do with the drugs for they were his." *Id.* at 611.

The court finds the statements made by Dennis Smith were not in response to any interrogation by officers. As in *Briones*, no question was posed to Dennis Smith in this case when he began to make statements to the officers. In fact, the officers did not engage him in conversation about the statements made in the kitchen. Further, the court will not find statements are the product of interrogation or its functional equivalent when the discovery of contraband, rather than police coercion, induces the incriminating statements. **See** *United States v. Hawkins*, 102 F.3d 973, 975-76 (8th Cir. 1996). Under the circumstances, the statements made by Dennis Smith were not made in the context of custodial interrogation and should not be suppressed.

Merolla contends her statements should be suppressed as the fruit of the unlawful entry, detention and search under *Wong Sun v. United States*, 371 U.S. 471 (1963). However, since the court has already found the entry, detention and search of the residence to be constitutionally justified statements asserted to be suppressed as the fruit of illegal police conduct should not be suppressed. There is no evidence Merolla made any statements, other than to deny permission to search, before she was informed of her rights under *Miranda*. The evidence shows Merolla's statements were voluntarily made. Accordingly, both of the defendants' motions to suppress statements should be denied.

**IT IS RECOMMENDED TO JUDGE LAURIE SMITH CAMP that**:

1.   Merolla's motion to dismiss Count IV of the Indictment as to Merolla (Filing No. 18) be granted;

2. Smith's motion to suppress (Filing No. 15) be denied; and

3. Merolla's motion to suppress (Filing No. 19) be denied.

## ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 3rd day of March, 2006.

BY THE COURT:

 s/Thomas D. Thalken
 United States Magistrate Judge